## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| LARRY A. DEUTSER, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | ) CASE NO. 09-CV-705-GKF-FHM |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of the | ) |
| Social Security Administration, | ) |
| | ) |
| DEFENDANT. | ) |

## REPORT AND RECOMMENDATION

Plaintiff, Larry A. Deutser, seeks judicial review of a decision of the Commissioner of the Social Security Administration denying Social Security disability benefits.[1] The matter has been referred to the undersigned United States Magistrate Judge for report and recommendation. *See* 28 U.S.C. § 636(b).

The role of the Court in reviewing the decision of the Commissioner under 42 U.S.C. §405(g) is limited to determining whether the decision is supported by substantial evidence and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Doyal v. Barnhart*, 331 F.3d 758 (10th Cir. 2003). The Court may neither

---

[1] Plaintiff's August 23, 2006 applications for Disability Insurance and for Supplemental Security Income benefits were denied initially and upon reconsideration. A hearing before an Administrative Law Judge (ALJ) was held February 2, 2009. By decision dated April 16, 2009, the ALJ entered the findings which are the subject of this appeal. The Appeals Council denied review of the findings of the ALJ on August 28, 2009. The action of the Appeals Council represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

reweigh the evidence nor substitute its judgment for that of the Commissioner. *See Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. *White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002).

Plaintiff was 54 years old at the time of the hearing. [R. 35]. He claims to have been unable to work since June 10, 2005, due to panic attacks, depression and right leg pain. [R. 39-41; Dkt. 17]. The ALJ determined that Plaintiff has severe impairments consisting of: dysthymic disorder, panic disorder, personality disorder and degenerative joint disease. [R. 14]. The ALJ found that, despite these impairments, Plaintiff retains the residual functional capacity (RFC) to perform light work[2] with simple repetitive tasks and incidental contact with the public. [R.16]. Based upon the testimony of a vocational expert (VE) at the hearing, the ALJ determined that Plaintiff's RFC prevented him from returning to his past relevant work (PRW) as a cook, dishwasher and cleaning supervisor but found that there are other jobs that exist in significant numbers in the economy that Plaintiff can perform. [R. 18-19]. He concluded, therefore, that Plaintiff is not disabled as defined by the Social Security Act. [R. 19-20]. The case was thus decided at step five of the five-step evaluative sequence for determining whether a claimant is disabled. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005) (describing the five steps); *Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (discussing five steps in detail).

---

[2] The Social Security Administration classifies jobs according to the physical exertion required to perform them.20 C.F.R. § 404.1567. "Light work" involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. § 404.1567(b).

Plaintiff asserts the following errors: 1) the ALJ failed to properly assess Plaintiff's RFC; 2) the ALJ erred in finding Plaintiff could perform other work; and 3) the ALJ failed to properly evaluate Plaintiff's credibility. For the following reasons, the undersigned recommends this case be reversed and remanded to the Commissioner for reconsideration.

## Medical History

Between May 2005 and May 2006, Plaintiff was hospitalized four times for Alcohol Abuse, Anxiety Disorder and Major Depression, Recurrent, Severe with Psychotic Features. [R. 203-257, 270-287, 298-313, 333-347, 359-361]. Upon discharge from Tulsa County Behavioral Health Center on May 8, 2006, Plaintiff's physical examination was normal except for complaints of chronic leg pain and mild gait abnormality. [R. 298-313]. His mental condition was reported to be improved and stable with medication. *Id.*

Treatment records from Family & Children's Services (F&CS) show Plaintiff was seen regularly for psychotrophic medication refills, counseling and psychiatric services and received assistance with procuring housing, food and transportation through the remainder of 2006 to at least December 2008. [R. 317-331, 348-357, 364-400, 433-455, 477-488]. He remained sober during those years and began working part-time at the Salvation Army Thrift Store. [R. 433-488]. Notable records from that time period include the following:

Case managers at F&CS reported on an updated treatment plan in July 2007, that Plaintiff was working, that he got along with co-workers, had good friendships and good working relationships and was excited about his new housing opportunity. [R. 364-376]. In August 2007, Plaintiff reported he had been denied SSI/SSDI benefits and that he had difficulty with anxiety and worry about paying his bills, though he was not behind in

3

payments. [R. 446]. He had good sleeping habits, good appetite, had no thought of harming himself or others and no problems with memory but he did have difficulty with concentration and "a hard time completing things." *Id.* He was attending AA meetings and going to church and reported good health except arthritis in his knees which bothered him daily. *Id.*

In October 2007, Plaintiff was noted to be well groomed, friendly and had a bright affect. [Dkt. 437]. He moved into a one-bedroom apartment and, as of April 29, 2008, was reported to be doing "great" on his medications, without significant problems with sleep, energy, interactions, appetite, concentration or guilt. [R. 454]. He was well groomed, had adequate hygiene, his affect was congruent, he had no homicidal ideation, no psychosis and his attention was observed to be adequate, his motor activity within normal limits and his judgment and insight was average. *Id.*

On September 29, 2008, Plaintiff was well groomed, with a calm mood and broad affect. [R. 478-479]. He stated his mood was good, that he had no depression and that his medication helped. *Id.* He stated he felt anxiety almost daily, that he had about three panic attacks over the past month without triggers, that he did not get agitated or angry easily, that he slept six to seven hours nightly and that he had no appetite change. *Id.* He reported he could focus and concentrate well, that his long-term memory was not good but his short-term memory was fine. *Id.* He said he attends AA once a month and has been sober for two years. He stated he had good relations with family members, had about five close friends and does not isolate. *Id.* He reported he was working part time and, though it was a struggle to pay bills, he "gets them paid." He said he does not have food stamps and has plenty of food, that he has his own transportation and that he has past financial debts but

4

no legal problems. [R.477-478]. At his medication review session on November 5, 2008, Plaintiff's appetite, sleep and energy were noted to be within normal limits. [R. 480]. His mood was euythmic, his behavior calm, his attitude neutral, his affect broad, his stressors were normal and he rated his depression as a 5 on a 10-scale. *Id.* His medications were "ok" and he was taking them as directed with no side effects. *Id.* The last treatment notation appearing in the F&CS records is dated December 4, 2008, and indicates Plaintiff reported good medication compliance with no side effects. [R. 481]. He had lost three pounds since his last appointment. *Id.* He denied significant problems with sleep, appetite, interest, energy, concentration, suicidal or homicidal ideation and he denied use of alcohol or drugs. *Id.* During the mental status examination, he demonstrated adequate attention and concentration, motor activity within normal limits and average judgment and insight. *Id.* He was instructed to continue his current medications and to return in two months. *Id.*

On May 30, 2007, Linda R. Craig, Psy.D., evaluated Plaintiff on behalf of the agency. [R. 420-422]. During the mental status examination, Plaintiff's mood was anxious; his affect congruent. His thought process was intact, thought content unremarkable, his speech was within normal limits, his cognitive abilities appeared normal and he had no signs of perceptual disturbances or psychosis. [R. 420]. Plaintiff's ability to focus and concentrate appeared normal. *Id.* His immediate, short-term and long-term memory appeared intact and his judgment was fair. *Id.* His intelligence appeared average. *Id.* His score on the MMSE indicated visual/spatial deficits. *Id.* Dr. Craig summarized Plaintiff's relevant background information, his mental health history, substance abuse history, medical, legal and work history. She noted that Plaintiff's activities of daily living include living by himself in a one-bedroom apartment, getting up around 6:00 a.m., taking care of

personal hygiene, going to work, returning home around 5:00 p.m., eating and watching TV and going to bed around 9:00 p.m. Plaintiff denied any significant social activities but got out of the house approximately five times a week to go to work and he used public transportation. [R. 421-422]. Dr. Craig diagnosed: dysthymic disorder (mild or moderate depression lasting at least two years); panic disorder without agoraphobia; alcohol dependence, in sustained remission, per patient; personality disorder NOS and she assessed his current and past year GAF at 55.[3] She said:

> Patient is a 52-year-old white never-married male who states he is seeking social security benefits because of inability to work due to anxiety. He appears to function within the average range of intellectual abilities. He presents with symptoms consistent with chronic depression, panic disorder, and alcohol dependence in remission. There is no evidence of malingering or secondary gain, under-reporting or over-reporting of symptoms. His ability to work is mildly impaired with respect to understanding complex instructions, remembering instructions, sustaining focus and concentration, and moderately impaired with respect to socially interacting with coworkers or public. He is capable of managing his own funds.

[R. 422].

A Psychiatric Review Technique form was completed by Janice B. Smith, Ph.D., on June 28, 2007. [R. 458-471].[4] Dr. Smith rated Plaintiff's functional limitations under the "B"

---

[3] A global assessment of functioning score "is a subjective determination based on a scale of 100 to 1 of the clinician's judgment of the individual's overall level of functioning. A GAF rating of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." A GAF rating of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.,* 34, (DSM-IV-TR (4th ed. 2000)).

[4] Under the regulations, when evaluating mental impairments, the agency must follow a "special technique." 20 C.F.R. §§ 404.1520a(a), 416.920a(a). The agency is required to rate the degree of a claimant's functional limitations caused by those impairments in the areas of "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. §§ 404.1520a(c)(3),
(continued...)

Criteria of Listings 12.04, Affective Disorders; 12.06, Anxiety-Related Disorders; 12.08, Personality Disorders; and 12.09, Substance Addiction Disorders. [R. 458]. She assessed "moderate" restrictions of activities of daily living, "moderate" difficulties in maintaining social functioning; "mild" difficulties in maintaining concentration, persistence or pace; and "one or two" episodes of decompensation, each of extended duration. [R. 468]. She noted Plaintiff's inpatient treatment in 2005, subsequent outpatient counseling with medications and Dr. Craig's mental status examination and diagnoses. [R. 470]. She said: "ADLs (activities of daily living) indicate he is able to do self-care, prepare easy meals, household chores, use public transportation, shop. Attends church 3 times per week, reports forgetting to take meds." *Id.*

Dr. Smith also filled out a Mental RFC form on June 28, 2007. [R. 472-475]. She assessed Plaintiff with "moderate" limitations in ability to understand, remember and carry out detailed instructions and "moderate" limitations in ability to maintain attention and concentration for extended periods. [R. 472]. She found his ability to interact appropriately with the general public was "markedly" limited. [R. 473]. Her explanation for these findings was as follows:

> Claimant is able to understand, remember, and carry out simple one-step tasks and some, but not all, more detailed tasks that do not require intense concentration. He is able to work under routine supervision. He is able to complete a normal work day and work week, and he can adapt to a work setting. He cannot relate effectively to the general public, but

---

[4] (...continued)
416.920a(c)(3). The ALJ then applies those ratings in determining whether the claimant's mental impairments are severe at step two and, if so, whether these severe impairments "meet[ ] or [are] equivalent in severity to a listed mental disorder" at step three. Id. §§ 404.1520a(d)(1-2), 416.920a(d)(1-2). At the ALJ hearing level, "[t]he decision must include a specific finding as to the degree of limitation in each of [those] functional areas." Id. §§ 404.1520a(e)(2), 416.920a(e)(2).

>           he can relate superficially to coworkers and supervisors about
>           work matters.

[R. 474].

With regard to Plaintiff's complaints of right knee and leg pain, the record shows that Plaintiff complained of chronic right knee pain and was diagnosed with arthritis when he presented to the emergency room on February 8, 2006, for treatment of chest pain. [R. 208-209].

When Plaintiff was admitted at Laureate Psychiatric Clinic and Hospital on February 12, 2006, he gave a history of "having been told" he had degenerative joint disease, and said that he had pain in his right knee "most of the time." [R. 274-275]. Examination of the extremities on that date revealed right knee enlargement with slight deformity, no swelling, good range of motion and good muscle strength.

An emergency room report dated February 25, 2006, indicates Plaintiff reported he had chronic right knee pain since he was age 13. [R. 203]. Plaintiff ambulated without difficulty and had full range of motion, pain free, but had positive findings of right knee deformity. [R. 204].

Upon admittance to the Tulsa Center for Behavioral Health (TCBH) on May 8, 2006, Plaintiff gave a history of chronic pain in his leg. [R. 298-313]. A mild gait abnormality was observed. [R. 303]. He was prescribed Seroquel (an anti-psychotic), Campral (for alcohol withdrawal symptoms), Celebrex (for pain, stiffness and swelling from osteoarthritis), Levaquin (for infection) and Prozac (for depression).[5]

---

[5] *Physicians' Desk Reference* (PDR) 62ed (2008) 3451; http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604028.html (last reviewed - 09/01/2008); http://www.nlm.nih.gov/medlineplus/drug info/meds/a699022.html (last Reviewed - 09/01/2008); http://www.nlm.nih.gov/medlineplus/druginfo/
(continued...)

The agency referred Plaintiff to Angelo Dalessandro, D.O., for a consultative physical examination on March 26, 2007. [R. 402-408]. Dr. Dalessandro observed a normal gait, flat affect, swelling in the right knee with tenderness on medial and lateral aspects and a "slight drawer's sign" and he noted that Plaintiff's right leg was two inches shorter than his left. *Id.* He diagnosed osteoarthritis of the right knee, major depressive reaction and alcohol abuse. *Id.* The doctor attached range of motion (ROM) charts to his report which showed normal findings except for reduced flexion of the "left" knee. [R. 407-409].

These finding were cited by Luther Woodcock, M.D., a non-examining consultative physician who evaluated Plaintiff's RFC for the agency on May 7, 2007, noting Dr. Dalessandro's findings without comment as to the discrepancy between Dr. Dalessandro's narrative report and his ROM charts. [R. 411-418]. Dr. Woodcock found Plaintiff was able to perform work activities as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 15 pounds; stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday and unlimited push and/or pull. [R. 412]. He found Plaintiff was able to frequently climb, balance, stoop, crouch and crawl but only occasionally kneel. [R. 413].

In the administrative record is a document dated January 5, 2009, titled: "After Care Instructions" from the OSU Medical Center regarding symptoms and follow-up for a

---

[5] (...continued)
meds/a601154.html (Last Revised - 04/01/2009); http://www.nlm.nih.gov/medlineplus/druginfo/meds/a689006.html (Last Revised - 09/01/2010).

diagnosis of degenerative joint disease. [R. 457]. There are no clinical or examination notes on the document or accompanying the document.

## **The ALJ's Decision**

The ALJ addressed Plaintiff's current work activity at the Salvation Army Thrift Store and determined Plaintiff's earnings did not constitute substantial gainful activity, therefore finding in Plaintiff's favor at step one of the evaluative sequence for determining disability. *See Williams*, 844 F.2d at 750-52. The ALJ concluded Plaintiff has severe impairments of dysthymic disorder, panic disorder, personality disorder and degenerative joint disease at step two. [R. 14]. At step three, the ALJ found Plaintiff's physical impairment did not meet Listings 1.02, 12.04, 12.06 and 12.08. [R. 15]. The ALJ determined Plaintiff had "moderate" restrictions in activities of daily living, "moderate" difficulties in social functioning and "moderate" difficulties in concentration, persistence or pace. *Id.* He found no episodes of decompensation which have been of extended duration. [R. 15]. The ALJ assessed an RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the [RFC] to occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk at least 6 hours in an 8-hour workday; sit for at least 6 hours in an 8-hour workday; and perform simple repetitive tasks with incidental contact with the public.

[R. 16]. Utilizing that RFC, the ALJ presented the vocational expert (VE) at the hearing with a hypothetical individual the same age, educational background and vocational experience as Plaintiff and asked whether such a person could perform his past relevant work. [R. 45-47]. The VE testified that the individual could not return to those jobs and the ALJ adopted the VE's testimony in this respect, thereby finding in Plaintiff's favor at step four. At step

five, however, the ALJ cited the jobs identified by the VE that the hypothetical individual could perform with such an RFC, such as an office cleaner and light assembler and found that they exist in significant numbers in the economy. *Id.* The ALJ denied Plantiff's claim for benefits at step five.

## Discussion

Plaintiff's first allegation of error relates to the ALJ's RFC assessment. [Dkt. 17, pp. 3-8; Dkt. 23, pp. 1-5]. In this regard, Plaintiff complains that the ALJ did not offer sufficient discussion of the weight he accorded Dr. Craig's report and that he did not specifically include Dr. Smith's moderate limitation in ability to maintain attention and concentration that was check-marked on the RFC form she filled out. [Dkt. 17, pp. 4-7]. Plaintiff also contends the ALJ erred in failing to include functional limitations in Plaintiff's RFC relating to degenerative joint disease, which he found was a severe impairment at step two.

In arriving at an RFC, agency rulings require an ALJ to provide a narrative discussion describing how the evidence supports his conclusion. *See* Soc.Sec.Ruling (SSR) 96-8p, 1996 WL 374174, at *7 (ALJ must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis --- and describe the maximum amount of each work related activity the individual can perform based on the evidence available in the case record). The ALJ must also explain how any material inconsistencies or ambiguities in the case record were considered and resolved. *Id.* "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence. *Id.* A function-by-function evaluation is necessary in order to arrive at an accurate RFC. *Id.* at *3-*4 (failure to first make a function-by-function

assessment of the claimant's limitations or restrictions could result in the adjudicator overlooking some of the claimant's limitations or restrictions).

In this case, the ALJ failed to articulate how the medical evidence in the record was weighed and how that evidence related to his assessment of Plaintiff's functional abilities in his RFC findings. Other than brief summarizations of portions of the medical evidence, the ALJ did not discuss the medical evidence. He did not explain the impact the evidence had upon his RFC assessment and he did not link his RFC findings to the evidence in the record. *See Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996) (holding that reviewing court cannot assess whether relevant evidence adequately supports the ALJ's conclusion in the absence of ALJ findings supported by specific weighing of the evidence); SSR 96-5p (adjudicators mush weigh medical source statements in accordance with 20 C.F.R. 404.1527 and 416.927).

The ALJ's RFC did not include any functional limitations relating to Plaintiff's knee and leg impairment. The ALJ mentioned the medical evidence regarding swelling in Plaintiff's right knee and that the right leg was 2 cm shorter than the left [R. 15] but he did not explain how this evidence comports with his RFC assessment that included the ability to stand and/or walk "at least" six hours in an 8-hour workday. Nor did the ALJ address the observations by medical care providers that Plaintiff had a mild gait abnormality and slight deformity of the right knee. [R. 204, 274-275, 303]. Although the ALJ is not required to discuss every piece of evidence, the decision must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the medical evidence and the reasons for that weight. *See Rutledge v. Apfel*, 230 F.3d 1172 (10th Cir. 2000) (citing *Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir.1997) (an ALJ must discuss the

12

evidence supporting his decision, the uncontroverted evidence he chooses not to rely upon, and any significantly probative evidence he rejects).

Plaintiff testified at the hearing that his right knee and leg hurts all the time, that the pain interferes with his ability to stand and walk and that the Salvation Army Thrift Store allows him to sit frequently and get off his leg quite a bit, about once an hour. [R. 40-41]. The ALJ pointed out that degenerative joint disease was diagnosed but not supported by radiographic evidence. [R. 17]. It is unclear what conclusion this comment was meant to convey because the ALJ did include the disease as a severe impairment at step two. If he intended to suggest that there was an inconsistency between Plaintiff's testimony regarding his inability to sit "for very long" and his need to "sit frequently to get off his leg," the ALJ did not follow-up the implication with any meaningful discussion.

Because the ALJ did not adequately address the medical evidence regarding Plaintiff's knee and leg impairment, his apparent conclusion that Plaintiff's testimony regarding functional limitations imposed by that impairment was not credible, is not based upon substantial evidence. The undersigned finds that this case should be reversed in order to afford the Commissioner the opportunity to properly address the medical evidence and articulate his findings in accordance with the correct legal standards.

Regarding Plaintiff's mental impairment, the decision reflects that the ALJ did consider the medical evidence. The ALJ cited portions of the treatment records from F&CS that relate to Plaintiff's denial of side effects from medications. [R. 17-18]. He also mentioned Dr. Craig's report in an abbreviated version of her summary paragraph. [R. 18, 422]. What the ALJ failed to do was to connect that evidence with his findings regarding Plaintiff's ability to perform work functions.

13

The ALJ stated he concurred with the findings of the state agency medical experts that Plaintiff could perform simple tasks with minimal contact with the public but he did not explain why his "B" criteria differed from theirs. [R. 15, 468]. The undersigned notes that the ALJ's RFC included a limitation to "simple <u>repetitive</u> tasks" but because the ALJ did not explain the basis for the limitations he assigned, the undersigned cannot assume that the "repetitive" work restriction was meant to accommodate Plaintiff's moderate limitations in ability to maintain attention and concentration for extended periods. The Court is not free to supply reasons not relied upon by the ALJ. *See Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) (ALJ's decision must be evaluated based solely on the reasons stated in the decision).

Because the ALJ did not sufficiently explain his findings or the reasons for his findings in his written decision, the undersigned cannot determine whether relevant evidence adequately supports the ALJ's conclusions. *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir.2004) ("That the record contains evidence that may support a specific factual finding cannot substitute for the finding itself."); *Drapeau v. Massanari*, 255 F.3d 1211, 1214 (10th Cir.2001) ("[W]e are not in a position to draw factual conclusions on behalf of the ALJ.") (internal quotation marks omitted).

At step five of the disability process, the burden shifts to the Commissioner to produce evidence that the claimant can perform other work. *Talbot v. Heckler*, 814 F.2d 1456, 1466 (10th Cir. 1987). The Commissioner did not meet that burden here. Therefore, the undersigned finds this case should be remanded in order for the ALJ to explain the weight he accorded the medical evidence, the reasons for that weight and to link his RFC findings with the medical evidence in accordance with the correct legal standards. *See*

*Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996) (Commissioner must apply the correct legal standards and show that he has done so). Because the credibility determination and findings at subsequent steps will need to be revisited after the Commissioner has reconsidered the medical evidence, the remaining allegations of error presented by Plaintiff are not addressed in this report and recommendation.

## **Conclusion**

The undersigned finds that the ALJ failed to adequately discuss the weight he accorded the medical evidence and failed to articulate his conclusions concerning Plaintiff's RFC by affirmatively linking those conclusions to the evidence. These errors led to deficiencies in the ALJ's determination regarding Plaintiff's credibility and his findings at subsequent steps in the evaluative sequence. Therefore, the undersigned RECOMMENDS this case be reversed and remanded to the Commissioner for reconsideration.

In accordance with 28 U.S.C. §636(b) and Fed. R. Civ. P. 72(b)(2), a party may file specific written objections to this report and recommendation. Such specific written objections must be filed with the Clerk of the District Court for the Northern District of Oklahoma on or before March 2, 2011.

If specific written objections are timely filed, Fed.R.Civ.P. 72(b)(3) directs the district judge to:

> determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

See also 28 U.S.C. § 636(b)(1).

The Tenth Circuit has adopted a "firm waiver rule" which "provides that the failure to make timely objections to the magistrate's findings or recommendations waives appellate review of factual and legal questions." *United States v. One Parcel of Real Property*, 73 F.3d 1057, 1059 (10th Cir. 1996) (quoting *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991)). Only a timely specific objection will preserve an issue for de novo review by the district court or for appellate review.

Dated this 16th day of February, 2011.

_____
FRANK H. McCARTHY
UNITED STATES MAGISTRATE JUDGE